# Illinois Official Reports

## Supreme Court

---

### *Jackson-Hicks v. East St. Louis Board of Election Commissioners*,
### 2015 IL 118929

---

| | |
|---|---|
| Caption in Supreme Court: | EMEKA JACKSON-HICKS, Appellant, v. THE EAST ST. LOUIS BOARD OF ELECTION COMMISSIONERS *et al.*, Appellees. |
| Docket No. | 118929 |
| Filed | March 16, 2015 |
| Decision Under Review | Appeal from the Appellate Court for the Fifth District; heard in that court on appeal from the Circuit Court of St. Clair County, the Hon. Heinz M. Rudolf, Judge, presiding. |
| Judgment | Election Board decision reversed. Cause remanded to the circuit court with directions. Mandate issued forthwith. |
| Counsel on Appeal | Eric W. Evans and Dawn O'Leary, of Evans Blasi, of Granite City, Burton S. Odelson, of Odelson & Sterk, of Evergreen Park, and Michael J. Kasper and James P. Nally, both of Chicago, for appellant. Garrett P. Hoerner, of Becker, Hoerner, Thompson & Ysursa, P.C., of Belleville, for appellees. |
| Justices | JUSTICE KARMEIER delivered the judgment of the court, with opinion. Chief Justice Garman and Justices Freeman, Thomas, Kilbride, Burke, and Theis concurred in the judgment and opinion. |

**OPINION**

¶ 1       The question presented by this appeal is whether a candidate for municipal office is entitled to have his or her name placed on the ballot if the governing election board has properly calculated and announced the minimum number of valid signatures required by statute to support the candidate's nominating petition, but the candidate's petition falls short of that legally mandated threshold. The election board in this case determined that Illinois law requires only substantial compliance with the numerical signature requirement and that the candidate whose eligibility is being challenged here had come close enough to the minimum requirement to permit his name to be placed before the voters. On judicial review of the board's decision, the circuit and appellate courts affirmed. 2015 IL App (5th) 150028. We granted leave to appeal. Ill. S. Ct. R. 315 (eff. Jan. 1, 2015). For the reasons that follow, we reverse the decision of the board and remand to the circuit court with directions.

¶ 2                                                    BACKGROUND

¶ 3       Alvin L. Parks, Jr., incumbent mayor of the City of East St. Louis, is seeking reelection in the April 7, 2015, municipal election. City officials in East St. Louis run for office on a nonpartisan basis, and the first step in Mayor Parks' reelection effort was to file nomination petitions to be included on the ballot for the February 24, 2015, consolidated primary.

¶ 4       By law, Mayor Parks' petitions were subject to the same rules set forth in section 10-3 of the Election Code (10 ILCS 5/10-3 (West 2012)) governing petitions filed by independent candidates. See 10 ILCS 5/10-3.1 (West 2012). Section 10-3 of the Election Code requires that such petitions be signed by a minimum number of qualified voters of the relevant political subdivision. A formula is specified for determining that number. 10 ILCS 5/10-3 (West 2012). Under that formula, nomination petitions for mayoral candidates in the upcoming East St. Louis election were required to have a minimum of 136 valid signatures. That figure was correctly calculated by election authorities and properly announced and publicized.

¶ 5       Mayor Parks filed his nomination petitions with the East St. Louis Board of Election Commissioners (Election Board), the governing election authority, in the time specified by law. His petitions contained a total of 171 signatures, a figure which appeared to give him 35 more than the minimum required. Shortly thereafter, however, Emeka Jackson-Hicks, who is also a candidate for mayor, filed an objection to Parks' nomination papers pursuant to section 10-8 of the Election Code (10 ILCS 5/10-8 (West 2012)). Her objection challenged the validity of some of the signatures and contended that Parks had not, in fact, submitted sufficient valid signatures to permit his name to appear on the ballot.

¶ 6       A hearing on Jackson-Hicks' objection was held by the Election Board on December 10, 2014. At that hearing, the attorney for the Election Board presented evidence that at least 48 of the signatures on Parks' petitions were invalid, leaving him with no more than 123 valid signatures. Twelve additional signatures were also questioned on the grounds that those persons were not actually registered to vote at the time they signed the petition, a circumstance that would render them ineligible to sign under section 3-1.2 of the Election Code (10 ILCS 5/3-1.2 (West 2012)). No other objections to the petitions were advanced or considered.

¶ 7        The following day, December 11, 2014, the Election Board issued a written decision denying Jackson-Hicks' objection. The decision stated that the objection petition was in the proper form, that it had been timely filed, and that all required notices had been issued and served in accordance with statutory requirements. It also concluded that, as Jackson-Hicks had charged, Parks' nominating papers had "insufficient signatures as required by law." Despite this deficiency, the Election Board held "that there has been substantial compliance in that 136 signatures are required and [Parks'] nominating papers contain 123 valid signatures." Based on this "substantial compliance" theory, the Election Board ordered that Parks' name "shall appear on the ballot for election to the office of Mayor of the city of East St. Louis" at the upcoming consolidated primary election.

¶ 8        Jackson-Hicks promptly filed a petition for judicial review of the Election Board's decision in the circuit court of St. Clair County (10 ILCS 5/10-10.1 (West 2012)), arguing that because Mayor Parks had failed to submit the minimum number of valid signatures required by the Election Code, the Election Board should have sustained her objection and prevented Parks' name from appearing on the ballot. Following a hearing, the circuit court rejected Jackson-Hicks' argument and upheld the Election Board's decision. In doing so, it relied on the same theory as the Election Board, namely, that Parks had "substantially complied" with the statutory signature requirement.

¶ 9        Jackson-Hicks next sought review from the appellate court. Again she was unsuccessful. The appellate court agreed that the Election Board had properly denied Jackson-Hicks' objection to Mayor Parks' nomination papers, notwithstanding the fact that Parks' petitions lacked the minimum number of signatures required by the Election Code, based on the theory of "substantial compliance." It therefore affirmed. 2015 IL App (5th) 150028.

¶ 10        The week after the appellate court filed its opinion, as corrected, Jackson-Hicks petitioned this court for leave to appeal pursuant to Supreme Court Rule 315 (Ill. S. Ct. R. 315 (eff. Jan. 1, 2015)). She also moved that we consider her petition on an expedited basis and, if we allowed it, that we set an expedited briefing schedule so that the matter could be resolved prior to the April 7 election. Jackson-Hicks' motion was granted. We allowed her petition for leave to appeal, ruled that her petition for leave to appeal would stand as her brief and set an expedited timetable for filing of the appellees' brief, a reply brief (if any), and the record. We also ordered that the case would be heard on the briefs without oral argument. The appellees' brief and reply briefs have now been filed, and the matter is ready for a decision on the merits.

¶ 11                                        ANALYSIS
¶ 12        As a preliminary matter, Mayor Parks contends we should not reach the merits of Jackson-Hicks' appeal because the matter is now moot. This argument is without merit. A case on appeal becomes moot where the issues presented in the trial court no longer exist because events subsequent to the filing of the appeal render it impossible for the reviewing court to grant the complaining party effectual relief. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 207-08 (2008). This is not such a case. Although the time for the scheduled February 24 primary has come and gone and materials submitted by Mayor Parks indicate that ballots have been printed and absentee voting has begun for the

April 7 consolidated general election, it remains possible for us to grant effectual relief to Jackson-Hicks.

¶ 13    East St. Louis operates under the managerial form of municipal government (see 65 ILCS 5/5-1-1 *et seq.* (West 2012)). In such municipalities, the elections for mayor are nonpartisan. The primary elections therefore do not determine nominees for particular political parties. Their purpose, instead, is to pare down the pool of mayoral candidates to a group of four, with the top four vote-getters remaining in contention and moving on to the general or consolidated election.[1] 65 ILCS 5/5-2-18.5 (West 2012).

¶ 14    Including Parks, only three candidates ended up filing nominating petitions for the office of mayor. There was therefore no need to reduce the number of mayoral candidates through the primary process. Accordingly, the actual primary for that office did not have to be conducted and was not held. See 65 ILCS 5/3.1-20-45 (West 2012). Whether Parks' nomination papers were proper remains significant, however, because one cannot appear on the ballot as a candidate for municipal office in municipalities operated under the managerial form of government unless one has first been a candidate for the office at the primary election. 65 ILCS 5/5-2-18.5 (West 2012). If we determine that Parks' nominating papers were insufficient and he did not qualify as a candidate at the primary election stage, his eligibility to be a candidate at the general election would fail as well.

¶ 15    Preventing Parks' name from being placed before the voters as a candidate for mayor was and remains the fundamental purpose of Jackson-Hicks' challenge. Although we cannot turn back the clock, the April 7 election has yet to occur, so it remains possible, theoretically at least, for ballots to be reprinted and electronic voting machines, if there are any, to be reprogrammed. Moreover, as we have recognized on prior occasions when confronted with similar time constraints, if it is too late for election officials to remove the name of an ineligible candidate prior to election day, a court may order election officials to disregard votes cast for that candidate. See, *e.g.*, *Delgado v. Board of Election Commissioners*, 224 Ill. 2d 481, 489 (2007); *Bryant v. Board of Election Commissioners*, 224 Ill. 2d 473, 480 (2007).

¶ 16    That absentee ballots may already have been cast in favor of Mayor Parks is unfortunate, but absentee voting and difficulty in notifying voters of ballot changes are common and unavoidable consequences of the narrow time frame in which election contests must be prosecuted. Mayor Parks has not cited any authority from Illinois or any other jurisdiction which has held that such considerations are sufficient, standing alone, to foreclose further judicial review of a timely and procedurally proper election challenge which concludes before the election cycle has ended. That is hardly surprising. If such circumstances were sufficient, in themselves, to render an appeal moot, meaningful judicial oversight of the electoral process would be all but impossible, and we would be powerless to prevent the election of candidates who failed to meet the requirements of the law.

¶ 17    Mayor Parks makes an alternative argument that:

> "[t]o the extent that this Court invokes the public interest exception to the mootness doctrine [citation], *** any legislative remedy by way of future amendment to Section 10-3 of the Illinois Election Code would warrant dismissal under the

---

[1]In even-numbered years, the election is called the general election. In odd-numbered years, it is referred to as the "consolidated election." 10 ILCS 5/2A-1.1 (West 2012).

mootness doctrine because such amendment would foreclose the possibility that the issues presented in the appeal will recur in a future case. Indeed, this Supreme Court has explained that an appeal is rendered moot, and not falling within the public interest exception to the mootness doctrine by an amendment to the subject matter during the pendency of an appeal that forecloses the possibility that the issues presented in the pendency of the appeal will recur in a future case."

¶ 18    We dispose of this argument with two brief observations. First, for the reasons we have just explained, the appeal is not moot. There is therefore no need for us to consider whether the public interest exception to the mootness doctrine should be invoked. Second, if there is, in fact, any impending legislation that bears on this appeal, Mayor Parks' brief gives no hint—none at all—as to what that legislation is, what it says, or when it might take effect. Absent such legislation, the point Mayor Parks tries to make is irrelevant.

¶ 19    We turn, then, to the merits of the case. Where, as here, an electoral board's decision is challenged in court pursuant to section 10-10.1 of the Election Code (10 ILCS 5/10-10.1 (West 2012)), the proceeding is in the nature of administrative review. When such proceedings reach our court on appeal, it is the election board's decision, not the decision of the circuit or the appellate court, that is before us. *Jackson v. Board of Election Commissioners*, 2012 IL 111928, ¶ 46; *Goodman v. Ward*, 241 Ill. 2d 398, 405 (2011).

¶ 20    The standard of review we apply to an election board's decision depends on what is in dispute: the facts, the law, or a mixed question of fact and law. *Jackson v. Board of Election Commissioners*, 2012 IL 111928, ¶ 47. In this case, there is no issue as to the facts. The dispositive question is whether the Election Board was correct when it interpreted the Election Code to permit the minimum signature requirement for nominating petitions to be judged based on a theory of "substantial compliance." Where, as here, historical facts are admitted or established and the only dispute concerns whether the governing legal provisions were interpreted correctly by election officials, the case presents a purely legal question for which our review is *de novo*, a standard we have characterized as "independent and not deferential." (Internal quotation marks omitted.) *Goodman v. Ward*, 241 Ill. 2d at 406.

¶ 21    When determining how the Election Code should be construed, we employ the same basic principles of statutory construction applicable to statutes generally. Our primary objective is to ascertain and give effect to the intent of the legislature. The best indication of legislative intent is the language employed by the General Assembly. When statutory language is plain and unambiguous, the statute must be applied as written without resort to aids of statutory construction (*id.* at 408), and the court will not read into it exceptions, conditions, or limitations that the legislature did not express (*Maksym v. Board of Election Commissioners*, 242 Ill. 2d 303, 318 (2011)).

¶ 22    As he has throughout these proceedings, Mayor Parks contends that the Election Board was within its authority to allow his name on the ballot, notwithstanding his failure to obtain the statutorily required minimum number of signatures, because the statutory signature requirement is merely directory and not mandatory and substantial compliance with the law's requirements will therefore suffice. In addressing this argument, we begin with familiar principles. The mandatory-directory dichotomy concerns the consequences of failure to fulfill an obligation, *i.e.*, whether " 'the failure to comply with a particular procedural step will or will not have the effect of invalidating the governmental action to which the

procedural requirement relates.' " (Internal quotation marks omitted.) *O'Brien v. White*, 219 Ill. 2d 86, 96 (2006) (quoting *People v. Robinson*, 217 Ill. 2d 43, 51-52 (2005)). Whether a statute governing elections is mandatory or directory "does not depend upon its form but upon the legislative intention to be ascertained from a consideration of the entire act, its nature, its object, and the consequences which would result from construing it one way or the other. [Citation.]" (Internal quotation marks omitted.) *Id.* at 96-97. If a statute prescribes a consequence for failing to obey its provisions, that is a strong indication that the legislature intended it to be mandatory. *Id.* at 96.

¶ 23 Generally speaking, requirements of the Illinois Election Code are mandatory, not directory (*Purnell v. Municipal Officers Electoral Board*, 275 Ill. App. 3d 1038, 1039 (1995); *Kellogg v. Cook County Illinois Officers Electoral Board*, 347 Ill. App. 3d 666, 670 (2004)). Consistent with the principles governing the mandatory-directory dichotomy, a candidate's failure to comply with mandatory provisions of the Election Code governing nomination papers will therefore render the nomination papers invalid (*Powell v. East St. Louis Electoral Board*, 337 Ill. App. 3d 334, 338 (2003)), and require that the candidate's name be removed from the ballot (*Knobeloch v. Electoral Board*, 337 Ill. App. 3d 1137, 1141 (2003)).

¶ 24 Statutory provisions such as those contained in our Election Code specifying numerical signature requirements are among those that are regarded as mandatory. See *In re Contest of the Des Moines Municipal Primary Election & General Election, Filed by Wingert*, 250 N.W.2d 731, 733 (Iowa 1977). Under the standards articulated in *O'Brien*, 219 Ill. 2d 86, we believe that the statutory signature requirements governing this election must likewise be given a mandatory reading.

¶ 25 The statute governing petitions for nomination of nonpartisan candidates is section 10-3.1 of the Election Code (10 ILCS 5/10-3.1 (West 2012)). It provides, in part, that nonpartisan petitions are subject to the same provisions of article 10 of the Election Code as those "relating to independent candidate petition requirements" to the extent those provisions are "not inconsistent with the requirements of such other statutes or ordinances [creating the political subdivision or providing the form of government thereof]." 10 ILCS 5/10-3.1 (West 2012). Article 10's independent candidate petition requirements, in turn, are set forth in section 10-3 of the Election Code (10 ILCS 5/10-3 (West 2012)).

¶ 26 Section 10-3 begins by stating that "[n]ominations of independent candidates for public office within any district or political subdivision less than the State, may be made by nomination papers." *Id.* The text of the law then continues by setting out the signature requirements for such petitions. Specifically, it specifies that the petitions are to be:

> "signed in the aggregate for each candidate by qualified voters of such district, or political subdivision, equaling not less than 5%, nor more than 8% (or 50 more than the minimum, whichever is greater) of the number of persons, who voted at the next preceding regular election in such district or political subdivision in which such district or political subdivision voted as a unit for the election of officers to serve its respective territorial area. However, whenever the minimum signature requirement for an independent candidate petition for a district or political subdivision office shall exceed the minimum number of signatures for an independent candidate petition for an office to be filled by the voters of the State at large at the next preceding State-wide general election, such State-wide petition signature requirement shall be

the minimum for an independent candidate petition for such district or political subdivision office." *Id.*

¶ 27     In arguing that the minimum signature requirements of section 10-3 are merely directory, Mayor Parks relies heavily on the legislature's use of the word "may" when addressing the utilization of nomination papers to nominate independent candidates. This reliance is misplaced. It is true that use of the word "may" is generally regarded as indicating a permissive or directory reading. *Robinson*, 217 Ill. 2d at 53. It is also true, however, that when interpreting a statute, a court must view the statute as a whole, construing words and phrases in light of other relevant statutory provisions and not in isolation. *People v. Perez*, 2014 IL 115927, ¶ 9. Applying that principle, it is apparent that "may" does not apply to the signature requirement, but rather to the more basic question of whether the nomination process may be utilized by independent candidates to appear on the ballot.

¶ 28     Article 7 of the Election Code (10 ILCS 5/7-1 *et seq.* (West 2012)), addresses "THE MAKING OF NOMINATIONS BY POLITICAL PARTIES" and provides a mechanism for selecting candidates belonging to those parties through petitions for nomination. Article 10, under which section 10-3 falls, addresses the "MAKING OF NOMINATIONS IN CERTAIN OTHER CASES," including minor political parties, independent candidates and nonpartisan candidates. 10 ILCS 5/10-1 *et seq.* (West 2012). Specifically, section 10-1 authorizes the use of a convention, caucus, or meeting to make nominations in certain cases. Section 10-2 sets up a petition process for forming new political parties and selecting their candidates, a process which includes the use of petitions. 10 ILCS 5/10-2 (West 2012).[2] Section 10-3, which immediately follows and is the statute involved here, provides that nomination of independent candidates "may also be made by nomination papers." 10 ILCS 5/10-3 (West 2012).

¶ 29     When one steps back and views these various provisions together and in sequence, a statutory framework emerges. Certain procedures to select candidates are available to certain groups and individuals under specified circumstances. By using the term "may" in section 10-3, the General Assembly was simply indicating that nomination using nomination papers is a mechanism available with respect to independent candidates.[3]

¶ 30     That nominations may be made through nominating papers is one thing. The sufficiency of those nomination papers is quite another. While section 10-3 (10 ILCS 5/10-3 (West 2012)) provides that nominations "may also be made by nomination papers," it does not say, and cannot be fairly read to mean, that the minimum number of signatures needed to support such nomination papers is anything but fixed and definite. Under the statute, the requisite number is determined according to a mathematical formula. The threshold number computed

---

[2]Portions of this statute have been invalidated by the United States Supreme Court. *Norman v. Reed*, 502 U.S. 279, 293 (1992).

[3]That aspect of section 10-3 is, of course, irrelevant to the matter at hand. This case involves nonpartisan candidates for municipal office. There is no need to clarify that those candidates may be nominated using nomination papers because section 10-3.1 (10 ILCS 5/10-3.1 (West 2012)) mandates it. It specifically provides that the substantive provisions of section 10-3 "shall apply to nonpartisan petitions to the extent that they are not inconsistent with the requirements of *** other statutes or ordinances [creating the municipality or providing the form of government thereof]." 10 ILCS 5/10-3.1 (West 2012).

using the specified formula is described as a "minimum signature *requirement*,' and in order for candidates to avail themselves of the statutory nomination procedure contained in the statute, the law specifies that their nominating papers contain valid signatures equal in number to "*not less than*" the minimum signature requirement. (Emphases added.) 10 ILCS 5/10-3 (West 2012).

¶ 31    Implicit in the law's provision that nominations may be made through nomination papers containing "not less than" the required minimum numbers of signatures is that nominations may *not* be made through nomination papers containing a number of signatures which *is* less than the minimum required by law. The latter proposition is a corollary of the former. It was no more necessary for the legislature to explicitly state the consequence of failing to meet its fixed numerical threshold than it would be in the case of the final election returns. When the law provides that a certain threshold is required in order to win an election, it is understood that if one fails to attain the threshold, one loses. Runners-up have no claim to office on a theory that they came close enough. So it has always been in American electoral politics. So it remains.

¶ 32    It is beyond dispute that access to a place on the ballot is a substantial right not lightly to be denied. *Bettis v. Marsaglia*, 2014 IL 117050, ¶ 28. We must also keep in mind, however, that the regulation of elections is within the power of the legislature, within constitutional limitations (*People ex rel. Schnackenberg v. Czarnecki*, 256 Ill. 320, 326 (1912)), for as the United States Supreme Court has recognized, "it is beyond question 'that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder.' [Citation.]" *Clingman v. Beaver*, 544 U.S. 581, 593 (2005). If an argument exists that the minimum signature requirements at issue in the case fail to serve a valid purpose and are beyond the constitutional authority of the legislature to regulate elections and prevent election- and campaign-related disorder, that argument has not been advanced in this case. The validity of the law, as written, is unchallenged.

¶ 33    In urging us to uphold the Election Board's decision, notwithstanding his failure to comply with the minimum signature requirements specified in the statute, Mayor Parks contends his nomination papers contained enough valid signatures to serve the underlying purpose of the law which, he contends, is simply to demonstrate that a candidate has "initiative and at least a minimal appeal to the voters." In Parks' view, that should be enough.

¶ 34    The Mayor's position is unprecedented, unworkable and contrary to law. Gauging candidate initiative and voter appeal were no doubt among the policy factors which gave rise to the legislature's decision to adopt a minimum signature requirement. What Mayor Parks fails to properly appreciate is that the power to set the standards for accomplishing those policy considerations is vested in the General Assembly, not the local election boards or the courts.

¶ 35    More than a century ago, this court held that "[e]very person has a right to be a candidate for any office for which he is legally qualified, but if every man might have his name on the official ballot great inconvenience might result. Therefore no person may have his name printed on the official ballot unless he has been nominated by a party or by a certain number of voters." *People ex rel. Schnackenberg v. Czarnecki*, 256 Ill. 320, 327 (1912). Through the clear language of sections 10-3 and 10-3.1 of the Election Code, the General Assembly has told us precisely what that certain number of voters must be in nonpartisan municipal

elections. In marked contrast to the standard urged by Parks, which is subjective, uncertain and changeable on a case-by-case basis, the General Assembly has opted for a mathematical formula which is precise and definite in its meaning, clear and certain in its application, and by its nature, excludes any possibility of impermissible political bias. That is the standard the Election Board was bound to follow. It is the standard we are required to enforce. To adopt the Mayor's position instead would require us to disregard the clear, unambiguous and mandatory language of the statute and graft onto it exceptions and limitations the legislature did not express. As noted at the outset of this opinion and confirmed by our election law jurisprudence, that is something the courts may not do.

¶ 36    To be sure, our appellate court has recognized that, in certain circumstances, substantial compliance can satisfy even a mandatory provision of the Election Code. See, *e.g.*, *Akin v. Smith*, 2013 IL App (1st) 130441, ¶ 3 (missing language in notarial jurats on statements of candidacy did not warrant exclusion of candidates from ballot); *Atkinson v. Roddy*, 2013 IL App (2d) 130139 (objection to nominating papers properly rejected even though candidate filed statement of economic interest in wrong county); *Samuelson v. Cook County Officers Electoral Board*, 2012 IL App (1st) 120581 (single nonconforming page of petition did not result in disqualification of candidacy); *Siegel v. Lake County Officers Electoral Board*, 385 Ill. App. 3d 452, 461 (2008) (good faith error in date listed by candidate in statement of candidacy and resolution to fill vacancy not sufficient to warrant removal of candidate from ballot). That precedent, however, is of no relevance here.

¶ 37    Unlike the foregoing authority, the case before us does not involve a situation where the candidate met the basic requirements of the Election Code, but did so in a technically deficient manner. Here, the candidate failed to meet a threshold requirement completely. While the signature requirement may have been aimed at showing candidate initiative and minimum voter appeal, showing candidate initiative and minimum voter appeal is not, itself, the standard. As we have explained, the clear and unambiguous standard adopted by the General Assembly requires compliance with a specific numerical threshold determined according to a specific mathematical formula. A candidate either meets that minimum threshold or does not. There is no close enough.

¶ 38    On two occasions our appellate court has confronted situations where the candidates in an election cycle have complied with the minimum signature threshold as computed by local election authorities, only to discover too late that election authorities had miscalculated and set the requisite number too low. In both cases, *Merz v. Volberding*, 94 Ill. App. 3d 1111 (1981), and *Atkinson v. Schelling*, 2013 IL App (2d) 130140, the appellate court determined that under the circumstances, the candidates should be permitted to remain on the ballot. In both cases, the appellate court relied on principles of estoppel and/or considerations of substantial compliance to justify their result.

¶ 39    The appellate court in the case before us found this authority highly persuasive. 2015 IL App (5th) 150028, ¶¶ 24-28. We do not. First, as just discussed, substantial compliance is not a valid justification for deviating from the clear and unambiguous minimum signature threshold set by the legislature. Second, putting aside the question of whether estoppel was even properly invoked against election authorities in those cases (see *Vestrup v. Du Page County Election Comm'n*, 335 Ill. App. 3d 156, 166 (2002) (expressly declining to follow *Merz* in part because "it failed altogether to acknowledge the specific rules regarding

- 9 -

estoppel against the State")), we note that no possible claim of estoppel can be raised in this case. The minimum signature requirement applicable to the mayoral race here was accurately computed and properly conveyed to all candidates by the Election Board. Finally, while *Atkinson* followed *Merz*, both the *Atkinson* court and the appellate court here overlooked that the *Merz* court limited its holding to the case at hand, expressly holding that "[f]or future reference, *** the minimum statutory signature requirement is mandatory and should be strictly followed." *Merz v. Volberding*, 94 Ill. App. 3d at 1118.

¶ 40    We do not see how the law could be otherwise. If the approach urged by Mayor Parks and adopted by the Election Board were accepted, there would be no way to insure consistency from one electoral jurisdiction to another, from one election to another, or even from one race to another. Local election officials could establish how many signatures are sufficient on a case-by-case basis according to a standard that is not only subjective and variable, but which lacks any obvious limits. Will 90% of the statutory minimum turn out to be enough? 75%? Less than that? Candidates will be left to speculate, and significant delay and uncertainty will inevitably result as objectors seek redress from the courts to review whether the signature cutoff was fairly and properly set by local election officials in particular cases.

¶ 41    The appellate court refused to consider these implications on the grounds that it was prohibited from expressing views on matters having only advisory effect. 2015 IL App (5th) 150028, ¶ 33. While it is the decision of the Election Board, not the appellate court, which is under review, we feel compelled to observe that the appellate court's analysis is flawed. Under the circumstances present here, consideration of the consequences flowing from one interpretation of the law or another is not inappropriate speculation on an abstract or hypothetical proposition. Rather, it is an important factor under the analytical rubric established by this court for assessing whether a provision of the Election Code is mandatory or directory. See *O'Brien*, 219 Ill. 2d at 97.

¶ 42    Under that rubric, and for all of the reasons set forth above, the minimum signature requirement imposed by section 10-3 of the Election Code (10 ILCS 5/10-3 (West 2012)) is mandatory and must be followed. In this case, the law required a minimum of 136 valid signatures. The other candidates met that threshold. Mayor Parks did not. The Election Board should therefore have granted Jackson-Hicks' objection, and ruled that Mayor Parks was ineligible to appear on the ballot for the upcoming East St. Louis municipal election. In light of this holding, we need not address Jackson-Hicks' additional argument that the Election Board's decision violated the equal protection clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). See, *e.g.*, *Davis v. City of Chicago*, 59 Ill. 2d 439, 443 (1974) (court will refrain from reaching constitutional question when resolution of that question is not necessary to the disposition).

¶ 43                                  CONCLUSION

¶ 44    For the foregoing reasons, the decision of the Election Board denying Jackson-Hicks' objection to the nominating petitions filed by Parks is reversed, and this cause is remanded to the circuit court of St. Clair County with instructions to enter judgment: (1) declaring that Parks' nominating petitions do not contain the minimum number of valid signatures required by law, (2) holding that Parks has not qualified to have his name appear on the ballot as a

candidate for the office of mayor in the April 7, 2015, municipal election, and (3) ordering that Parks' name be immediately removed from the ballot for that election. The court's judgment shall further provide that if the Election Board receives any ballots cast prior to removal of Parks' name, the Election Board shall be required to disregard any votes cast for Parks when determining the winner of the election for the office of mayor. Our mandate shall issue forthwith.

¶ 45        Election Board decision reversed.

¶ 46        Cause remanded to the circuit court with directions.

¶ 47        Mandate issued forthwith.