2021 IL App (2d) 210085-U
No. 2-21-0085
Order filed March 8, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| MATTHEW CORBIN, | ) | Appeal from the Circuit Court |
| | ) | of Du Page County. |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | No. 21-MR-129 |
| | ) | |
| MARY SCHROEDER, | ) | |
| SHARON SULLIVAN, | ) | |
| JONATHON NUSGART, | ) | |
| LINDA JACKSON, and | ) | |
| JEAN KACZMAREK, | ) | |
| as Du Page County Clerk, | ) | Honorable |
| | ) | Bonnie M. Wheaton, |
| Respondents-Appellees. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court.
Presiding Justice Bridges and Justice Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The electoral board's decision, overruling objections to the candidate's nominating papers, is affirmed.

¶ 2    Respondent, Linda Jackson, filed nominating papers to run in the upcoming April 6, 2021, consolidated election for the office of Glendale Heights Village President. Petitioner, Matthew Corbin, objected to Jackson's nominating papers on several bases, including that the statutory

minimum threshold for valid signatures was not satisfied. On February 4, 2021, after a hearing, the Glendale Heights Municipal Officers Electoral Board (the Board), of which respondents Mary Schroeder, Sharon Sullivan, and Jonathon Nusgart are members, overruled Corbin's objections. Corbin petitioned the circuit court for judicial review. On February 19, 2021, the court denied the petition for review and affirmed the Board's decision.[1]

¶ 3        On February 22, 2021, Corbin filed a notice of appeal. On February 26, 2021, pursuant to Illinois Supreme Court Rule 311 (eff. July 1, 2018), this court granted Corbin's motion to place the case on this court's accelerated docket. We denied, however, his request for a stay pending appeal. For the following reasons, we affirm.

¶ 4                                I. BACKGROUND

¶ 5        On January 23, 2021, the Board held a hearing to address Corbin's objections to Jackson's nominating papers. As relevant here, Marie Schmidt testified that, since 2008, she has served as the Glendale Heights Village Clerk. One of her responsibilities as clerk is to serve as an election authority, including on the Board, although she recused herself from the Board for this case. In her capacity as clerk, and regarding nominations of candidates for office in Glendale Heights, Schmidt prepares candidate packets, in which she includes for prospective candidates various

---

[1] We note that Corbin filed objections to the nominating papers filed by three candidates for Glendale Heights Village President: Jackson, Edward Pope, and Chodri Ma Khokhar. On January 23, 2021, the Board held a hearing addressing all objections, and it issued written decisions on January 28, 2021, (Khokhar) and February 4, 2021, (Jackson and Pope), rejecting Corbin's objections to all three candidates. Although related, we address each appeal separately, addressing Pope's and Khokhar's candidacies in appeal Nos. 2-21-0086 and 2-21-0090, respectively.

documents, including a list of instructions, but *not* a statement regarding how many signatures are required for nominating petitions. In previous years, Schmidt received by mail packets of information from the Du Page County Election Commission; however, that commission was dissolved and, therefore, for the upcoming election, Schmidt received by email information packets from an election official in the Du Page County Clerk's office. Schmidt testified that she reviewed a candidate's handbook, published by the State Board of Elections, that said a candidate for Village president needed to obtain signatures from 1% of the number of voters that participated in the 2017 mayoral election. Unlike past years, there was no maximum percentage listed. Schmidt personally performed a calculation to assess 1% of voters from the 2017 election (2325 voters) and determined that candidates for Village president needed to obtain 24 signatures for their nominating papers.

¶ 6 Upon further questioning, Schmidt testified that, in past years, candidates for Village president had to obtain signatures from 5% to 8% of the number of voters that had voted in the relevant preceding election.[2] This year, "[i]n reading the [c]andidate's book, it said [1%] for non-

_____

[2] Section 10-3 of the Election Code (10 ILCS 5/10-3 (West 2018)) provides, in relevant part:

"Nominations of independent candidates for public office within any district or political subdivision less than the State, may be made by nomination papers signed in the aggregate for each candidate by qualified voters of such district, or political subdivision, equaling not less than 5%, nor more than 8% (or 50 more than the minimum, whichever is greater) of the number of persons, who voted at the next preceding regular election in such district or political subdivision in which such district or political subdivision voted as a unit for the election of officers to serve its

partisan. And I had received an email from someone who works for the election division who said due to COVID, we are reducing the points of contact, here is a list of forms. *** And it said this is what you should fill out, and it said partisan election. We are non-partisan, so I looked up non-partisan. I thought it was all due to COVID." Schmidt explained that she did not agree with the number being so low, as it could potentially bring out many candidates, and that she discussed the low threshold with various members of the Village Board, although not in an open session, stating, "I can't believe they are being that stupid and only asking for [1%]." After a board meeting, she also discussed the threshold with candidate Jackson, and told Jackson that they needed only 24 signatures and could easily obtain that amount. Schmidt testified that she did not have conversations with any other candidate for president regarding the 1% threshold. However, Schmidt is running again for the clerk position, believed that she, too, needed only 24 signatures for her nominating papers, and also communicated the 24-number requirement to one of her own opponents. According to Schmidt, no one told her before the filing deadline had passed that the 1% threshold was incorrect, and she noted that it was difficult to contact persons in the election office when information was initially circulated, as the partial shutdown during the COVID-19 pandemic left the election office understaffed.

¶ 7    On cross-examination, Schmidt agreed that she did not discuss the 24-signature requirement at a public board meeting or with any other candidates, nor did she post that information on the clerk's website or include it in the packets available to the public. Schmidt testified that there is no requirement for the clerk to post the minimum number of signatures required, and the Village did not and (never has) publicly announce required numbers. Schmidt

_____

respective territorial area." 10 ILCS 5/10-3 (West 2018).

asserted that she emailed the election office to question the threshold, but did not recall receiving a response. She later testified, however, that she did *not* reach out to the Du Page County Clerk Election Manager in relation to the signature numbers, because she had unsuccessfully tried to contact the office in the past while it was understaffed. An email from that office had mentioned, in one paragraph, COVID-19 and reducing contact; thus, that paragraph partly influenced Schmidt's understanding that the threshold for signatures had changed due to COVID:

"*** at that point, there were people talking about how they were going to circulate petitions. And again, that goes to the low number in my mind because a lot of people were not answering their doors because of COVID.

When I had someone going out with my petitions, it would be call you, say I'm bringing a petition. Will you meet me outside? I'll leave it on your porch. You sign it. Go back in the house and I'll get it. It was a tedious process. So this all made sense.

There were people who were leaving them on their front porches which violated everything because you didn't witness anyone doing it. And it was going on in the Village.

***

I honestly thought it was because of COVID and reducing the point of contact. Everything has changed in the past year. Nothing is the same. And it made sense that you would require fewer signatures and have fewer points of contact."

Schmidt agreed, however, that she did *not* receive a notice from the Governor, State Board of Elections, the Du Page Election Commissioner, or anyone else, stating that the statutorily required number of signatures had been reduced because of COVID.

¶ 8    Finally, Schmidt testified to her understanding that the Village performed non-partisan elections. She did not, in the fall of 2020, understand the difference between non-partisan and

independent candidates. The emailed information that Schmidt had received from the Du Page County Clerk's office listed five categories of signature requirements. For independent candidates, it required 5% to 8%, as Schmidt recalled from past elections. Schmidt testified that this year has been "very different" and "I *misinterpreted* it." (Emphasis added.) Schmidt agreed that she and Jackson used the "independent candidate" petitions when circulating their nomination papers. She agreed that, in the candidate packets, it "clearly states" that candidates should check the requirements with their attorneys. Schmidt did not consult an attorney about the signature requirements.

¶ 9 Jackson testified that she has been Village President for 20 years; she was first elected in 2001 and won re-election in 2005, 2009, 2013, and 2017. She has also previously held other public offices. Jackson testified that, to prepare and gather her nominating petitions, she has always obtained the petition packages from the Village Clerk and then asked the Clerk how many signatures were needed. Jackson recalled that, in all prior elections, she was required to gather a minimum-signature requirement of 5% and that there was also a cap on how many to submit, but she also did not calculate those figures herself, instead relying on information from the Village Clerk. According to Jackson, around September 2020 and while they were present at the Village Hall, she asked Schmidt how many signatures she needed for her petitions and Schmidt replied "24." Jackson stated:

> "[a]nd I said you have to be kidding me. That is way, way down from what we normally have to do. And she said yes. She says, but with COVID and trying to cut back on personal contact with other people, it made sense to me. And that means that everything in our lives has changed because of COVID. And we deal with those changes every day. And it just made sense that they would try and keep personal contact down."

¶ 10    Jackson recalled that, whenever she saw Schmidt thereafter, they expressed that they could not believe the number requirement. Jackson said that Schmidt showed her a document that said non-partisan, 1%, and Jackson "totally agreed." Jackson did not calculate the 1% number; she asked Schmidt, who told her, orally, that 24 signatures were needed. According to Jackson, Schmidt is a phenomenal clerk, she believed that Schmidt informed her of the signature requirement while acting in her official duties as clerk, and that she relied on Schmidt's representation. According to Jackson, had she known that the signature threshold was higher, she would have gathered more signatures. In fact, in case there was a limit on how many were allowed, Jackson gathered 26 extra signatures that she did not submit. Jackson ultimately submitted 50 total signatures.

¶ 11    Jackson testified that she "absolutely" believed that she was a "non-partisan" candidate, as she has never, in any election concerning the Village, declared herself as representing a political party. She agreed, however, that she utilized in her nominating papers the "independent" candidate forms. Jackson agreed that, in her history as Village President, she was not aware of the Village ever changing from a "partisan" Village to a "non-partisan" Village. Jackson discussed with other trustees, signature gathers, family, and others their collective disbelief that the threshold signature number could be so low. She did not, however, consult, for example, an attorney, the candidate's guide published by the State Board of Elections, the Local Election Official Handbook, or reach out to the Du Page County Clerk's election division for clarification or confirmation. Nor was the 24-signature requirement discussed at any public Village Board meetings. Jackson never saw a court order or Governor's order that said that, because of COVID, signature requirements for this election would be reduced to 1%.

¶ 12    Michael Marron testified that he is the Village Administrator.  He recalled having a conversation with Schmidt in the office, at the end of August or early September 2020, wherein Schmidt said "wow," and asked him if he knew that the signature requirement was reduced to 24 because of COVID.  He did not investigate or verify that information.  After December 30, 2020, and after Corbin's objections were filed, Marron recalled a telephone conversation with Jackson, wherein she commented that she believed that she had the required number of signatures based on her conversations with Schmidt and she believed, due to COVID, the numbers were lower and that there had been changes in how the general elections had been handled.  Upon her request, he verified that two other candidates, Khokhar and Ontinveroz[3] had submitted "well over 100 signatures, that might have been over 200," whereas she and candidate Pope did not submit many. Marron contacted the Village Attorney to reconcile and understand how many signatures had been required and whether there had been any changes because of COVID.  To his knowledge, the call he initiated was the first time there was contact from the Village to attorneys concerning the signature requirements.  Marron explained his view that it is difficult to determine whether an election is partisan or non-partisan, as there is nothing in the Village ordinances dictating that, but he learned that it was a partisan election and that candidates run as independent candidates.

¶ 13    On February 4, 2021, the Board, having taken, over Corbin's objection, judicial notice of voluminous executive orders issued by Governor J.B. Pritzker and local emergency orders and proclamations that had issued in light of the pandemic, rendered a written decision, concluding, in sum, that Corbin's objections that Jackson's petitions contained less than the statutorily-required

_____

[3] Ontinveroz presently remains on the ballot for Village President.

minimum number of signatures failed, as Jackson justifiably relied on Schmidt's representation that only 24 signatures were needed.

¶ 14    Specifically, the Board noted that the parties agreed that the question of reliance is a factual one.  Citing *Merz v. Voldberding*, 94 Ill. App. 3d 1111 (1981), and *Atkinson v. Schelling*, 2013 IL App (2d) 130140, the Board determined that, here, Schmidt, acting as Village Clerk, made a mistake when calculating the signature requirement, based upon: her confusion as to whether the Village was nonpartisan; the Du Page County Clerk not providing specific instructions and nomination papers, as it had done in past elections; and the COVID-19 pandemic.  As in *Merz* and *Atkinson*, the Board found no evidence of nefarious conduct on Schmidt's behalf.  The Board took judicial notice of the "extraordinary circumstances" that existed during the 90-day petition circulation period.  The Board made several unanimous findings of fact, including that: the witnesses were credible; Schmidt acted in an official capacity as Village Clerk and as a local election official when she told Jackson (and Walters, who then told Pope) the 24-signature requirement; Jackson and Pope relied on those official representations; and denying the candidates access to the ballot would penalize not only them, but the voters.

¶ 15    Two Board members found that Jackson's reliance on Schmidt's representations was justified, while the third member asserted that he did not find the reliance justified, based upon the decision in *Jackson-Hicks v. East St. Louis Board of Election Commissioners*, 2015 IL 118929 (2015), and when compared with *Merz* and *Atkinson*.  The Board's majority, however, found *Jackson-Hicks* inapplicable, as the candidate in that case did not raise an estoppel/reliance defense; rather, the case concerned only substantial compliance.  Although it acknowledged that *Jackson-Hicks* had discussed *Merz* and *Atkinson*, it did not read that decision as forever precluding candidates, regardless of the circumstances, from asserting a reliance or estoppel argument.

"Given the extraordinary circumstances presented by the COVID-19 pandemic, difficulty in maintaining social distancing when gathering voters' signatures on petition sheets, limited access to and communication with the Du Page County Clerk, the [l]ocal [e]lection [a]uthority, this Electoral Board finds that[,] given the undisputed and unrefuted facts and evidence presented at the evidentiary hearing," Jackson and Pope successfully raised and established the defense of justifiable reliance on the signature requirement communicated to them by the Village Clerk. Thus, the Board overruled Corbin's objections and ordered that Jackson's name be placed on the ballot as a candidate in the upcoming election.

¶ 16    Corbin petitioned the circuit court for judicial review. On February 19, 2021, after a hearing, the circuit court denied the petition and affirmed the Board's decision. The court determined that it need not find, under these facts, the minimum number of signatures that were, in fact, statutorily required for the petitions, and to do so would be purely advisory. The court commented that whether the Village election is a partisan or non-partisan one is confusing and should be clarified for future elections. The court found that publication is not limited to publication in writing, a statement may be published orally (as it is in libel versus slander), and that the Clerk's statements here were orally published to Jackson and, ultimately, to Pope. The court noted that the Board found credible the candidates' testimonies and that this case was similar to *Atkinson*. Moreover:

> "The question of whether this was reasonable I believe is limited to the facts which are presented. The Court will take judicial notice that we are in the midst of a global pandemic, which has changed many, many things in the legal system, and indeed, in the electoral system as well, with the prevalence now of mail-in voting or drop box ballot provisions. This is something that has really never taken place before the pandemic.

Reliance on the representations of the clerk, whether right or wrong, in the midst of the global pandemic cannot be set as a matter of law to have been unreasonable. It seems that most of the candidates and other persons who testified felt that the number was extremely low, and perhaps, indeed it was. However, that does not go to the question of whether under these particular circumstances that low number was unreasonable to be relied on."

¶ 17    The court noted that the candidates testified that they collected more signatures that they did not file, and, again, that the Board found credible their testimonies. It upheld the Board's decision and ordered that Jackson appear on the ballot. Corbin appeals.

¶ 18                                    II. ANALYSIS

¶ 19    Where a circuit court has reviewed an electoral board's decision, we review the decision of the board, not the court. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 212 (2008). An electoral board is viewed as an administrative agency; thus, our standard of review is determined by the type of question being reviewed. *Id.* at 209-10. The board's findings and conclusions on questions of fact are deemed *prima facie* true and correct and will not be overturned unless they are contrary to the manifest weight of the evidence, while we review *de novo* its decision on a question of law. *Id.* at 210. Moreover, the board's determination on a mixed question of law and fact will not be disturbed on review unless it is clearly erroneous. *Id*. at 211.[4] A decision is "clearly erroneous" when the reviewing court is left with the " 'definite

---

[4] We note that, although Corbin argues that our review is purely *de novo*, we disagree. The Board made findings of fact and determined that, based on those facts, Jackson had established a reliance claim. Therefore, the determination was a mixed question of law and fact and we will not

and firm conviction that a mistake has been committed.' " *Id.* at 211 (quoting *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 395(2001)). We are mindful that, "[b]y use of the phrase 'judicial review,' the legislature did not intend to vest a circuit court with jurisdiction to conduct a *de novo* hearing into the validity of a candidate's nomination papers." *Id.* at 209.

¶ 20 Corbin challenges three overarching Board decisions. First, he asserts that the Electoral Board and the circuit court did not determine the minimum signatures required for independent candidates under section 10-3 of the Election Code and specifically, whether the decision in *Ramirez v. Chicago Board of Election Commissioners*, 2020 IL App (1st) 200240, warrants a different result. Specifically, to calculate the 5% minimum and 8% maximum signatures required, the Board must first determine which preceding regular election applies, as section 10-3 bases the figures on "the next preceding regular election in such district or political subdivision in which such district or political subdivision voted as a unit for the election of officers to serve its respective territorial area." 10 ILCS 5/10-3 (West 2018). Corbin argues that the November 2018 general election is the appropriate election to use to calculate the 5% minimum signatures (which had a higher number of voters and, thus, would require more signatures), but the Board did not decide this question.

¶ 21 We disagree that we need to reach this issue here. As noted by the circuit court, to do so would be purely advisory. The candidates did not come close to the statutory threshold minimums, regardless of whether the 2017 or 2018 election figures are used. The sole question is whether the Board properly found that the candidates reasonably relied on the misinformation provided by the

---

disturb it unless clearly erroneous. *Id.*

Village Clerk. Nevertheless, we note that, in related appeal No. 2-21-0090, we consider the issue and conclude that the 2017 election was the proper election under section 10-3. See *Corbin v. Schroeder*, 2021 IL App (2d) 210090, ¶¶ 16-17 (unpublished order under Supreme Court Rule 23).

¶ 22 Next, Corbin argues that, regardless of which election is chosen, Jackson's nominating papers lacked the minimum number of valid signatures and the Board erroneously allowed Jackson to invoke an estoppel defense to prevent her removal from the ballot. Specifically, Corbin argues that the Board erred in finding that Jackson reasonably relied upon the Village Clerk's statement that she needed only 1% (or 24 signatures) on her nominating petitions, such that her submission of 50 signatures, which is below the minimum required, may be excused. Corbin argues that estoppel fails, first, because the Clerk's statements were unauthorized acts of a ministerial officer or a ministerial misinterpretation and were *not* affirmative acts of the governmental body itself. Further, Corbin disagrees that Jackson's reliance on the statements was reasonable, noting that, despite her prior experience and admitted disbelief that the signature requirement could be so low, she took no action to independently investigate or verify the information, or to consult an attorney, election authority, or election consultant. Corbin requests this court to reverse the Board and order Jackson's name removed from the ballot.

¶ 23 A summary of the relevant authority is required. The Board primarily relied on two cases in finding successful Jackson's reliance or estoppel argument: *Merz* and *Atkinson*. Indeed, those cases share factual similarities with this case and, in both, in reliance on misinformation provided to them by the city/village clerks, who had misinterpreted section 10-3 of the Election Code, candidates failed to obtain the minimum number of signatures required for their petitions. In both cases, the courts determined that the candidates' reliance on the misinformation had been

reasonable and that they could remain on the ballots. *Merz*, 94 Ill. App. 3d at 1117-18; *Atkinson*, 2013 IL App (2d) 130140, ¶¶ 17-21.

¶ 24 Specifically, in *Merz*, certain candidates relied on the clerk's information sheets, which she had also issued in the past, to determine the number of required signatures. However, the clerk had used the wrong election as the basis for her calculations, and the court agreed that the statute was unclear. *Merz*, 94 Ill. App. 3d at 1114. Given that: the statute was unclear; the clerk's historical practice of handing out information sheets prior to elections had gone unchallenged for years and was performed as a public service (as opposed to with intent to undermine the statutory scheme); and one candidate actually obtained the correct number of signatures required, but had submitted only the incorrect number, the court held that penalizing the candidates would be an injustice. *Id.* at 1117-18. Further, although only one of the three candidates involved testified to relying on the clerk's misinformation, such that only one could invoke estoppel, the court found that the two other candidates (lacking sufficient signatures and an ability to claim detrimental reliance) should also remain on the ballot in the "interests of justice," because they had demonstrated at least a minimal appeal to voters and their removal would, therefore, also penalize those voters. *Id.* The court in *Merz* limited its holding to the facts before it, expressing that, "for future reference, *** the minimum statutory signature requirement is mandatory and should be strictly followed." *Id.* at 1118.

¶ 25 In *Atkinson*, a panel of this court followed *Merz*. See *Atkinson*, 2013 IL App (2d) 130140, ¶ 19. There, after relying on a letter from the village clerk, who was a veteran in that position, and a candidate's guide issued by the State Board of Elections, mayoral candidates collected an insufficient number of signatures for their petitions. This court affirmed the board's decision to allow the candidates to remain on the ballot, essentially following *Merz*'s rationale. *Id.* The court

acknowledged that, in an intervening decision, *Vestrup v. Du Page County Election Comm'n*, 335 Ill. App. 3d 156 (2002), another panel of this court had declined to follow *Merz* and was critical of that court's application of estoppel against a State body. *Atkinson*, 2013 IL App (2d) 1330140, ¶ 19. The court in *Vestrup* had explained that estoppel would "be a concession that an administrative agency's mistaken interpretation of a state statute can preclude a court from enforcing that statute. Essentially, [candidate] would have us give an interpretative error the force of law and precedence over the law as enacted by the elected lawmakers of the State of Illinois. This is entirely unacceptable ***." *Vestrup*, 335 Ill. App. 3d at 166-67. Nevertheless, the panel in *Atkinson* noted that the holding in *Merz* was undisturbed and, further, that nothing in section 10-3 addressed a remedy for noncompliance with its requirements, so ballot removal would be a drastic remedy where the statute provided none, particularly where the candidates before it had demonstrated even more than the minimal appeal to voters than the candidates had shown in *Merz*. *Atkinson*, 2013 IL App (2d) 130140, ¶¶ 19-21.

¶ 26    Our supreme court has expressed, at best, skepticism over the *Merz* and *Atkinson* analyses. See *Jackson-Hicks*, 2015 IL 118929 (2015). Specifically, in *Jackson-Hicks*, a mayoral candidate submitted more signatures than required by the statutory minimum, but, after objections, the number fell below the minimum threshold. The election board concluded that his name could remain on the ballot, since he was short only 13 signatures and had substantially complied with the statute. The supreme court reversed the election board's decision that substantial compliance with the statutory minimum was adequate, holding that the statutory numerical signature requirements are mandatory, the failure to comply with mandatory provisions in section 10-3 of the Election Code render nominating papers invalid and require the candidate's name be removed from the ballot, and noting that, although the appellate court had found *Merz* and *Atkinson*

persuasive, "we do not." *Id*. ¶¶ 23-25, 39. The court noted that, in both cases, the *Merz* and *Atkinson* courts had relied on principles of estoppel or considerations of substantial compliance to justify their results, but the *Jackson-Hicks* court instead: (1) cited favorably *Vestrup*'s concern over the propriety of invoking estoppel against the election authorities in those cases; (2) noted that *Merz* was limited to the facts before it; and (3) reiterated that the minimum statutory requirement must be strictly followed: "[w]e do not see how the law could be otherwise," or there would be no way to insure consistency. *Id*. ¶¶ 39-40. Indeed, the court held that, as opposed to subjective, uncertain, and changing standards, the "General Assembly has opted for a mathematical formula which is precise and definite in its meaning, clear and certain in its application, and by its nature, excludes any possibility of impermissible political bias. That is the standard the Election Board was bound to follow. It is the standard we are required to enforce." *Id.* at ¶ 35. Accordingly, the court ordered the candidate's name removed from the ballot and that any votes received for him be disregarded. *Id*. at ¶ 44.

¶ 27    As noted by the Board, estoppel was not, in fact, before the court in *Jackson-Hicks*, and, therefore, its criticism was aimed at the appellate court having relied on those decisions in the substantial-compliance case before it. Indeed, unlike here, there was no confusion in *Jackson-Hicks* over the required signature threshold; rather, the candidate simply did not obtain enough signatures. Moreover, and as discussed further below, when the *Jackson-Hicks* candidate circulated petitions, there was no global pandemic impacting all aspects of life. Further, *Merz* and *Atkinson* have not been overruled, and we do not read *Jackson-Hicks* as barring the possibility of an estoppel argument in all election cases. Rather, we read it as essentially cautioning that, with respect to section 10-3's mandatory-signature requirements, estoppel will rarely, if ever, be appropriate.

¶ 28    The case here arose in exceedingly rare circumstances.  We agree with the Board that the COVID-19 pandemic is an exceptional circumstance.  Indeed, and as noted by the voluminous executive orders from the Governor and actions of which the Board took judicial notice, beginning in March 2020, the pandemic affected procedures in virtually all aspects of life.  For example, citizens were *ordered* to remain home, socially distance, wear masks, and sanitize hands and surfaces frequently.  Many of those changes continue, as of the date of this decision, and they certainly existed during the 90-day petition circulation period.  Indeed, precautions were particularly emphasized during the petition-circulation period, as the winter season and holidays approached.  Those circumstances are relevant because, as the record reflects, they informed the actions taken by the relevant parties.  Jackson was surprised by the low number of signatures required and, indeed, her political experience apprised her that this was a marked deviation from prior requirements.  Viewed in a vacuum, it would be easy to wonder, in hindsight, why she did not consult an attorney or verify the requirements through other means.  However, the Board found reasonable and credible her testimony that, during the relevant period, her surprise at the low signature number was quickly tempered by her knowledge that virtually all facets of life had changed, on account of the pandemic, such that requiring a lower number of signatures to minimize in-person contact and maintain social distancing simply made sense and would allow candidates to comply with both requirements, *i.e.*, the statute's requirement to obtain signatures and requirements issued via executive orders to maintain social distancing.  She recalled that changes to voting procedures had also been made, because of the pandemic, during the November 2020 election, and she assumed that Schmidt, a reliable veteran in her position, was correct that the change in the nominating process would also serve to reduce in-person encounters and the spread of COVID-19.  While the evidence reflects that, in fact, there was no change to the requirements

and Schmidt mistakenly consulted the requirements for a different type of candidacy, the critical inquiry here is not just why Schmidt made a mistake but, rather, why Jackson relied on it and whether that reliance was, under the extraordinary circumstances, reasonable. In his reply brief,[5] Corbin emphasizes that the candidates failed to produce documentary evidence concerning past practices, yet their testimony *was* evidence, and the Board unanimously found it credible. Given the evidence before it, the Board's finding that this case presented exceptional circumstances, such that Jackson's reliance on the Clerk's information was reasonable, was not contrary to the manifest weight of the evidence.

¶ 29    Of course, as Corbin notes, to validly assert estoppel, the reliance must have been based on an act by a public entity. For example, to validly assert estoppel against a public body, "there generally must be an affirmative act on the part of the public body that induces substantial reliance, and that affirmative act generally must be an act of the public body itself such as a legislative enactment, rather than the unauthorized acts of a ministerial officer or a ministerial misinterpretation." (Emphases added.) *Preuter v. State Officers Electoral Board*, 334 Ill. App. 3d 979, 990-91 (2002). Courts are reluctant to estop the State from enforcing its laws, in part because "valuable public interests may be jeopardized or lost by the negligence, mistakes[,] or inattention of public officials." (Emphasis added.) See *Vestrup*, 335 Ill. App. 3d at 166 (citing *Brown's Furniture, Inc. v. Wagner*, 171 Ill. 2d 410, 431-32 (1996)). Courts have also held that "estoppel will only apply in extraordinary and compelling circumstances." *Morgan Place of Chicago v. City*

---

[5] We note that Corbin's reply brief was, technically, untimely, as it was filed a few minutes past the deadline. As this failure does not implicate our jurisdiction, we choose to overlook it and consider the arguments raised therein.

*of Chicago*, 2012 IL App (1st) 091240 ¶ 33. Here, Corbin argues that Schmidt's acts represent quite literally an unauthorized ministerial misinterpretation, not an act of the election authority, such that Jackson's defense must fail.

¶ 30    We disagree. The Board's findings that Schmidt published the information in her capacity as Village Clerk and as an election official was not contrary to the manifest weight of the evidence. The evidence reflected that, in her duties as Village Clerk, Schmidt serves as an election authority and, indeed, sits as an Electoral Board member. We note that, in the "2021 Candidate's Guide" issued July 2020 by the State Board of Elections, which was in the record before the Board, it states, on page 15, that, while candidates are "strongly advised" to obtain legal counsel concerning the number of signatures required for the relevant office, it also provides: "**NOTE**: *Candidates should contact* the election authority or *the local election official who is responsible for receiving the filing of the petition* [*i.e.*, here, the Clerk] for nomination and/or election to office for further information *as to the specific number of signatures required* on a nominating petition for a specific office (or for the data needed to calculate that number)." (Emphasis added; bolded emphasis in original.) While it is true that Schmidt, as Clerk, did not issue written publications, such as those that were referenced in *Merz* and *Atkinson*, we agree with the circuit court's comment that publication may be oral and that Schmidt historically has provided signature-requirement information to candidates upon request, and, specifically, to Jackson in several elections. We also note that this is not a case where the Clerk acted nefariously, in attempt to undermine the statutory scheme. She did not, for example, offer conflicting information to different candidates. Rather, her publication was consistent; indeed, Schmidt informed her *own* opponent that a low number of signatures was required. Thus, although Corbin tries to cast Schmidt's communications as behind-the-scenes covert comments that may create a slippery slope for future cases, those simply are the

not the facts reflected by the evidence. Again, while Corbin raises valid concerns that reliance cases are ripe for potential abuse, we emphasize that the Board decisively found no abuse *here*. As such, the Board's finding that Schmidt acted in the capacity of local election official was not contrary to the manifest weight of the evidence.

¶ 31    We also note that, as Corbin points out, it is true that the percentage of signatures Jackson collected, as compared with those required (regardless of number used), is significantly lower than those collected by the candidates in *Merz* and *Atkinson*. However, we still think it reasonable for the Board to find that Jackson demonstrates a minimal appeal to voters (indeed, the purpose that drives section 10-3's requirement (see *Merz*, 94 Ill. App. 3d at 1118 (citing *Briscoe v. Kusper*, 435 F.3d 1046, 1054 (7th Cir. 1970)))), as she: (1) collected more signatures than necessary, and would have collected more, but for Schmidt's representations; and (2) has been elected Glendale Heights President in *five* prior elections. "It is beyond dispute that access to a place on the ballot is a substantial right, not lightly to be denied." *Jackson-Hicks*, 2015 IL 118929, ¶ 32. Thus, keeping Jackson's name off the ballot here, under these unusual circumstances, would potentially penalize not only Jackson, but also the Glendale Heights voters. See *Atkinson*, 2013 IL App (2d) 130140, ¶ 21.

¶ 32    Finally, we reject Corbin's argument that the Board erred when it consolidated the hearings concerning his objections to candidates Jackson and Pope. The record reflects that the Board consolidated the cases because they concerned the same issues, overlapping witness testimony, were of an expedited nature, and because of COVID. The hearings, even consolidated, lasted several hours, with attendees present either in person in face masks or via Zoom. As the circuit court noted, if there was error in the Board's decision to consolidate the proceedings, it should not be held against the candidates.

¶ 33    In sum, we affirm the Board's decision that, here, Jackson reasonably relied upon the Village Clerk's representation that a minimum of 24 signatures were needed for the nominating petitions.  To be sure, the evidence reflected that the Village Clerk is a trusted veteran in that position.  Jackson discussed the requirements with the clerk, just as she has, without problem, in all previous elections.  While Corbin's arguments, overall, assert that the candidates acted negligently, the Board found the witnesses and their explanations credible.  And while Corbin suggests that there is simply no room to consider the world's circumstances when assessing a reliance claim or when counting signatures, we are not prepared to say the same.  More importantly, we do not think that *Jackson-Hicks* so held.  However, like the court in *Merz*, we, too, limit our holding to the unusual facts before us and stress that the COVID-19 pandemic presented *exceptional* circumstances that informed the reasonableness of the reliance claim here.  We strongly emphasize that our decision should not be read broadly or be construed as minimizing the importance of strict compliance with statutory requirements.  Rather, we acknowledge that the pandemic's extreme alterations of procedures and norms influenced this case and, as the pandemic is, hopefully, a once-in-a-lifetime event, similar circumstances are unlikely to arise again.

¶ 34                                    III. CONCLUSION

¶ 35    For the foregoing reasons, the order of the circuit court of Du Page County affirming the decision of the electoral board is affirmed.  Our mandate shall issue forthwith.

¶ 36    Affirmed.

¶ 37    Mandate issued forthwith.