2021 IL App (2d) 210090-U
No. 2-21-0090
Order filed March 8, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| MATTHEW CORBIN, | ) | Appeal from the Circuit Court |
| | ) | of Du Page County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 21-MR-108 |
| | ) | |
| MARY SCHROEDER, | ) | |
| SHARON SULLIVAN, | ) | |
| JONATHON NUSGART, | ) | |
| CHODRI MA KHOKHAR, | ) | |
| JEAN KACZMAREK, as Du Page County | ) | |
| Clerk, and THE GLENDALE HEIGHTS | ) | |
| MUNICIPAL ELECTORAL BOARD, | ) | |
| | ) | |
| Respondents, | ) | Honorable |
| | ) | Craig R. Belford, |
| (Chodri Ma Khokhar, Respondent-Appellant). | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court.
Presiding Justice Bridges and Justice Schostok concurred in the judgment.

**ORDER**

¶ 1     *Held*:   We reverse the circuit court's judgment and affirm the electoral board's decision.

¶ 2     Respondent, Chodri Ma Khokhar, filed nominating papers to run in the upcoming April 6,

2021, consolidated election for the office of Glendale Heights Village President.   Petitioner,

Matthew Corbin, objected to Khokhar's nominating papers on several bases, including that the statutory minimum threshold for valid signatures was not satisfied. On February 4, 2021, after a hearing, the Glendale Heights Municipal Officers Electoral Board (the Board), of which respondents Mary Schroeder, Sharon Sullivan, and Jonathon Nusgart are members, overruled Corbin's objections.

¶ 3    Corbin petitioned the circuit court for judicial review. On February 11, 2021, the court reversed the Board, struck certain signatures from Khokhar's nominating papers, and ordered Khokhar's name removed from the ballot.[1] On February 19, 2021, the court denied Khokhar's request to "vacate the default judgment."

¶ 4    On February 23, 2021, Khokhar filed a *pro se* notice of appeal. On February 26, 2021, pursuant to Illinois Supreme Court Rule 311 (eff. July 1, 2018), this court granted Khokhar's motion to place the case on this court's accelerated docket. We denied, however, his request for a stay pending appeal. For the following reasons, we reverse the court's judgment and affirm the Board.

¶ 5                                      I. BACKGROUND

---

[1] We note that Corbin filed objections to the nominating papers filed by three candidates for Glendale Heights Village President: Khokhar, Linda Jackson, and Edward Pope. On January 23, 2021, the Board held a hearing addressing all objections, and it issued written decisions on January 28, 2021, (Khokhar) and February 4, 2021, (Jackson and Pope), rejecting Corbin's objections to all three candidates. Although related, we address each appeal separately, addressing Jackson's and Pope's candidacies in appeal Nos. 2-21-0085 and 2-21-0086, respectively.

¶ 6     On January 23, 2021, the Board held a hearing to address Corbin's objections to Khokhar's nominating papers.  The Board adopted rules and procedures for the hearing.  As relevant here, Rule 4(l) notes: "The Board shall as a matter of procedure, not consider signatures that are filed in excess of the statutory maximum for any elected office."  Further, Rule 22 provides: "at any subsequent record check objection hearing before the Board, *the ruling made by the clerks shall be deemed valid*, and the moving [p]arty shall have the burden of demonstrating that the ruling was incorrect by a preponderance of the evidence."  (Emphasis added.)

¶ 7     In his objections, Corbin requested that the Board make a finding concerning which election (2017 or 2018) applied under section 10-3 of the Election Code (10 ILCS 5/10-3 (West 2018))[2] to form the basis of the signature requirements.  At the hearing, he also argued that, if the Board were to consider the statutory percentages as derived from 2017 election, such that 118 signatures was the minimum required (5%) and 188 the maximum (8%), it should strike any signatures Khokhar had submitted beyond number 188.  In discussion, the Board: recognized that it had no specific rule for *striking* the signatures; noted that, although section 10-3 sets a cap at

---

[2] Section 10-3 of the Election Code provides, in relevant part:

"Nominations of independent candidates for public office within any district or political subdivision less than the State, may be made by nomination papers signed in the aggregate for each candidate by qualified voters of such district, or political subdivision, equaling not less than 5%, nor more than 8% (or 50 more than the minimum, whichever is greater) of the number of persons, who voted at the next preceding regular election in such district or political subdivision in which such district or political subdivision voted as a unit for the election of officers to serve its respective territorial area."  10 ILCS 5/10-3 (West 2018).

8%, it provides no consequence for submitting signatures exceeding 8%; and it essentially summarized its belief that, even without considering signatures beyond number 188, Khokhar would have enough signatures. Thus, it declined Corbin's request to strike the excess signatures.

¶ 8 Next, the Board was informed by its counsel that the Du Page County Clerk had deferred ruling on Corbin's objections to three signatures and, so, for those, the Board would need to "look at the signature that appears on the petition sheet and match it with the signature clip that's in the records exam. And that's pretty easily done." The Board reviewed those three signatures, including for line 7 on sheet 11, and overruled Corbin's objections.[3] The Board determined that Khokhar had presented 129 valid signatures (*i.e.*, starting at 198 originally included on the petitions and subtracting 69 signatures that were stricken after the clerk sustained Corbin's objections).

¶ 9 Corbin next explained that, in his view, 45 rulings from the clerk's signature-records check remained incorrect. The Board's counsel, however, stated that reviewing those signatures would be very time consuming and, as the records exam had already rejected those challenges, "these signatures are presumptively valid as a result of the records exam, and unless you can show us something that clearly indicates that, one, the voter is not registered; two, it's not their genuine signature; three, they live out of the district, or some other objection that would lodge, I would recommend that the Electoral Board not proceed on trying to overturn decisions that are presumptively valid." The Board agreed, with one member commenting that there was no need to

---

[3] We note that, as to the signature for line 7 on sheet 11, Khokhar explained that he had obtained an affidavit from the signatory. The Board's counsel explained, "if the case gets to the point where you have to present evidence, you can," but that it was overruling Corbin's objection to that signature.

revisit objections that had already been ruled on. Corbin explained that he could demonstrate facial defects, such as, for example, that one name appeared on the face of the petition, while a different name was used on the record comparison. The Board's counsel noted, however, that the Board's rules of procedure (Rule 22) required an objector to present evidence, such as an affidavit (further noting again that Khokhar had, in fact, obtained affidavits, which could, only if necessary, be discussed) or registration records that would defeat or negate the findings of the records exam. Corbin disagreed that there was a specific evidence requirement beyond mere comparison of the petition and record signatures, while the Board's counsel reiterated that, absent a third component of evidence beyond the two signatures, "you're just asking us to do this two-step process *** it's a lot of time and effort; and if there is no evidence presented, all you're asking us to do is second guess someone else." The Board ended the hearing in agreement that Corbin had not presented a "scintilla" of evidence to overturn the presumptively-valid decisions of the county clerk, and that Khokhar had presented 129 valid signatures on his petition sheets.

¶ 10    On January 28, 2021, the Board issued a written decision, concluding, in sum, that: (1) pursuant to section 10-3 of the Election Code, the April 2017 consolidated election was the most recent election in which Glendale Heights voters had voted for a Village-wide office holder and, therefore, 118 valid signatures on the nominating papers were required; (2) Khokhar had obtained 126 presumptively-valid signatures;[4] and (3) Corbin failed to produce evidence, such as from a handwriting expert, affidavits, or voter-registration records, demonstrating that any of the signatures previously reviewed and validated by the records clerk, thus now considered

_____

[4] The body of the decision discusses that Khokhar provided 129 valid signatures; the conclusion held that he provided 126 valid signatures. The reason for the discrepancy is unclear.

presumptively-valid, were more likely than not *invalid*. The Board noted that it had declined, in the absence of Corbin's presentation of affirmative evidence, to "undertake a second look or guess" over those presumptively-valid signatures. Moreover, it explained its decision not to strike signatures beyond the 188 maximum contained in Khokhar's petition. It noted that its rules did not direct or require the Board to strike excess signatures, and while decisions such as *Richards v. Lavelle*, 620 F.2d 144, 147-48 (7th Cir. 1980), and *Wilson v. Municipal Officers Electoral Board for City of Calumet City*, 2013 IL App (1st) 130957, ¶¶ 12-14, reflect that an electoral board may elect to promulgate rules to deal with excess signatures, the operative word was "may." Here, the Board had not adopted such a rule and, therefore, it had voted unanimously to deny Corbin's request to strike the excess signatures. The Board ordered that Khokhar's name be placed on the ballot as a candidate in the upcoming election.

¶ 11 Corbin petitioned the circuit court for judicial review.[5] On February 19, 2021, the circuit court issued an 11-page written memorandum decision. As relevant to this appeal, the court determined that the Board correctly ascertained, pursuant to section 10-3 of the Election Code, that Khokhar's petitions required 118 valid signatures. However, the court determined that the Board erred, as a matter of law, where it did not ignore or strike 12 signatures that exceeded the statutory

---

[5] If the court held a hearing, we do not have a transcript from it in the record. As we review the Board's decision, not the court's, the absence of a hearing transcript is not ultimately fatal to our ability to address the issues. We note, however, that Khokhar asserts in his notice of appeal and opening brief that he tried to attend a hearing in person, was told that in-person hearings were not being conducted due to restrictions related to the COVID-19 pandemic and, therefore, that he should connect for a Zoom hearing, but, when he tried to do so, the Zoom platform did not work.

maximum allowed for submission. Relying on *Ghiles v. Municipal Officers Electoral Board*, 2019 IL App (1st) 190117, ¶ 18, the court noted that section 10-3 of the Election Code "limits" the number of signatures that a candidate may submit and, thus, whether by ignoring or striking them, the Board should not have considered or counted any signatures Khokhar had submitted beyond number 188. In a footnote, the court noted that its conclusion that the Board should have ignored or stricken those signatures was not dispositive, as the Board had found that, even without counting those contained in the superfluous 12, Khokhar had produced at least 118 valid signatures. Moreover, the court stated that, by its own count, "even without signatures 189-200, the Board's analysis below would still leave [Khokhar] with 121 valid signatures."

¶ 12    The court also found erroneous the Board's decision to overrule Corbin's objections to certain signatures previously reviewed by the county clerk in its records check. Specifically, the court noted that the Board refused to undertake review of Corbin's objections on the basis that the clerk's decisions rendered the challenged signatures presumptively valid, and Corbin had not presented *evidence* to rebut their validity. However, the court determined, while some of Corbin's objections might have required affirmative evidence to rebut the signature validity, some of them did not. Based upon its own review of the signatures, the court found that at least 10 required nothing more than a cursory comparison of the signature on the petition with the signature from the records check to reflect that, on their face, Corbin's objections to those signatures were meritorious. With respect to those 10 signatures, including that on line 7 of sheet 11, "[Corbin] met his burden of proof simply by drawing the Board's attention to the manifest discrepancy between the signature on the petition and the signature from the records check. To this court's eye, it appears not just 'more likely than not' but rather altogether certain that *** the signature on the petition and the signature on the records exam do not match and were rendered by entirely

different people.  The only evidence the Board needed to make this determination was the evidence it already possessed[.]"  The court determined that the Board's decision not to undertake review of those 10 objections was, therefore, clearly erroneous, and its resulting decision that Corbin failed to meet his burden of proof as to those 10 objections was contrary to the manifest weight of the evidence.  Accordingly, the court determined that Khokhar's 121 presumptively-valid signatures (again, the court reached that number after setting aside signatures beyond number 188) must be reduced by 10, leaving 111 signatures in total.  Thus, because Khokhar's nominating petition lacked 118 valid signatures, the court reversed the Board's decision and ordered Khokhar's name stricken from the April 6, 2021, consolidated election ballot.  Khokhar appeals.

¶ 13                                     II. ANALYSIS

¶ 14    Where a circuit court has reviewed an electoral board's decision, we review the decision of the board, not the court.  *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 212 (2008).  An electoral board is viewed as an administrative agency; thus, our standard of review is determined by the type of question being reviewed.  *Id.* at 209-10.  The board's findings and conclusions on questions of fact are deemed *prima facie* true and correct and will not be overturned unless they are contrary to the manifest weight of the evidence, while we review *de novo* its decision on a question of law.  *Id.* at 210.  The board's determination on a mixed question of law and fact will not be disturbed on review unless it is clearly erroneous.  *Id*. at 211.  A decision is "clearly erroneous" when the reviewing court is left with the " 'definite and firm conviction that a mistake has been committed.' "  *Id.* at 211 (quoting *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 395 (2001)).  We are mindful that, "[b]y use of the phrase 'judicial review,' the legislature did not intend to vest a circuit court with jurisdiction to conduct a *de novo* hearing into the validity of a candidate's nomination papers."  *Id.*

at 209. Further, electoral boards may adopt their own rules of procedure and rules of evidence. See 10 ILCS 5/10-10 (West 2018). A reviewing court must give deference to the election board's application of its rules unless its decision was arbitrary or unreasonable. *Wiesner v. Brennan*, 2016 IL App (2d) 160115, ¶ 34. In his *pro se* brief, Khokhar argues that the court erred in striking his signatures and that the Board's decision was correct. For the following reasons, we agree.

¶ 15 Preliminarily, we note that Khokhar does not, as appellant, challenge the court's determination that, using the 2017 election, his petitions required at least 118 valid signatures. Of course, he would not be inclined to challenge this, as it provides a lower threshold than would be required by using the 2018 election, as championed by Corbin. Corbin is not the appellant, nor even a cross-appellant, and, therefore, there is no pending valid challenge before us to the finding that 118 signatures were needed for the petition. However, as seen below, we ultimately hold that the Board correctly found that Khokhar met the threshold signature requirement, and to do so we must at least inherently agree with the Board's and circuit court's decision that using the 2017 election or 118-minimum-signature threshold was correct. We agree with the circuit court's statutory analysis on this issue, and we quote it at length to adopt it as our own.

¶ 16 After summarizing section 10-3 of the Election Code, noting that the dispute centered upon whether the 2017 or 2018 election constituted "the next preceding regular election in such district or political subdivision in which such district or political subdivision voted as a unit for the election of officers to serve its respective territorial area," (10 ILCS 5/10-3 (West 2018)), and summarizing well-established rules for statutory interpretation, the court held:

"Here, the plain and ordinary language of section 10-3 is clear. For purposes of determining the minimum signature requirement for an independent candidate for public office within any district or political subdivision less than the State, the relevant election is

- 9 -

that in which 'the next preceding regular election in such district or political subdivision in which such district or political subdivision voted as a unit for the election of officers to serve its respective territorial area.' 10 ILCS 5/10-3 (West 2018). The key language here is 'voted as a unit' and 'to serve its respective territorial area.' The phrase 'voted as a unit' is clearly meant to identify those elections in which the outcome is determined solely and uniquely by the voters in question. Otherwise, how can it possibly be said they are acting 'as a unit'? To illustrate, though the voters of Glendale Heights certainly participate in the election of this State's governor, they do not do so 'as a unit' because they are not reaching a collective decision on that question. By contrast, when the voters of Glendale Heights vote to elect a village president, they are unquestionably acting 'as a unit' because the collective decision they reach is what determines the outcome. To the extent there is any doubt about this, all of it vanishes with the phrase 'to serve its respective territorial area.' It goes without saying that, in this phrase, the antecedent for the pronoun 'its' is the 'district or political subdivision' in question, which in this case is the Village of Glendale Heights. And according to Merriam-Webster's Online Dictionary, 'respective' means 'particular, separate.' Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/respective (last visited on Feb. 11, 2021). Thus, as used in section 10-3, the phrase 'to serve its respective territorial area' means 'to serve the Village of Glendale Heights' particular and separate territorial area.' And just as with the phrase 'as a unit,' this phrase can only be referring [to] Village office holders. To again illustrate, although Governor Pritzker unquestionably serves the 'territorial area' known as the Village of Glendale Heights, he does not do so 'particularly' or 'separately.' By contrast, this is exactly how the village president serves the Village of Glendale Heights. Taking all of this

together, this court concludes that, for purposes of this case, the relevant election for determining the minimum signature requirement for the office of village president is the April 2017 Consolidated Election, as this is the most recent election in which the voters of the Village of Glendale Heights voted 'as a unit' for the election of officers to serve separately and particularly the Village of Glendale Heights.

In opposition to this result, [Corbin] cites to the First District Appellate Court's decision in *Ramirez v. Chicago Board of Election Commissioners*, 2020 IL App (1st) 200240. *Ramirez* is easily distinguished. In *Ramirez*, the court was asked to determine which preceding election would serve to determine the minimum signature requirement for a candidate seeking to run for ward committeeperson in Chicago's First Ward. The answer to that question was found not in section 10-3 of the Election Code but[,] rather[,] in section 7-10, which reads very differently. See 10 ILCS 5/7-10 (West 2018). In relevant part, section 7-10 first provides that '[i]f a candidate seeks to run for ward committeeperson, then the candidate's petition for nomination must contain no less than the number of signatures equal to 10% of the primary electors of his or her party of the ward.' 10 ILCS 5/7-10(i) (West 2018). Section 7-10 then goes on to state that '[f]or wards or districts of political subdivisions, the number of primary electors shall be determined by taking the total vote cast for the candidate for that political party who received the highest number of votes in the ward or district at the last regular election at which an officer was regularly scheduled to be elected from that ward or district.' 10 ILCS 5/7-10(k) (West 2018). The petitioner in *Ramirez* argued that, based on this language, the relevant election was the March 2016 primary because that was the last election in which the voters of the First Ward elected someone to an office that serves only the First Ward, namely, ward committee

person. The *Ramirez* court rejected this argument and affirmed the Board of Elections' determination that the relevant election was the November 2018 general election. In reaching this result, the *Ramirez* court explained:

'Petitioner asks this court to read section 7-10(k) as though it stated that the board should use "the last regular election at which an officer was regularly scheduled to be elected" *exclusively* "from that ward" or *for* that ward. See 10 ILCS 5/7-10(k) (West 2018). However, as petitioner readily acknowledges, neither the words "exclusively" or "for" are actually in the statute. Thus, he is asking us to read into the statute words which are not there. (Emphasis in original.) 2020 IL App (1st) 200240, ¶ 26.'

In the end, the *Ramirez* court stated that it agreed with the Board's conclusion that 'an officer is elected "from" a ward when the voters are entitled to cast votes for an officer, even if the officer is not elected exclusively from that ward.' *Id.* ¶ 27.

To restate, the key factor for the *Ramirez* court was the fact that section 7-10(k) contains no language indicating that the relevant election is the most recent one in which a candidate was elected to an office that serves the local territorial unit in question *exclusively*. This is significant because, as discussed above, section 10-3 *does* contain precisely such language—specifically, that the relevant election is 'the next preceding regular election in such district or political subdivision in which such district or political subdivision voted *as a unit* for the election of officers *to serve its respective territorial area*.' (Emphasis added.) 10 ILCS 5/10-3 (West 2018). Given this, there is no question that the Board was correct to conclude that, for purposes of calculating the minimum

signature requirement for the election at issue in this case, the relevant election is the April 2017 Consolidated Election and the resulting number is 118."

¶ 17    Next, with respect to signatures exceeding the statutory "cap" of 8%; Khokhar does not specifically object to the circuit court's analysis on that point, although he is *pro se* and argues, generally, that he provided sufficient signatures and that the Board's decision should be upheld. Ultimately, we need not address the propriety of the court's decision that the Board erred as a matter of law when it did not strike the signatures in accord with its Rule 4(l). We again agree with the court that the Board did not actually count any of those signatures, instead finding that Khokhar had submitted more than the required minimum without considering the excess signatures.

¶ 18    Thus, the decisive issue here is whether the Board's finding that the 10 signatures (identified by the circuit court) were valid was contrary to the manifest weight of the evidence, or whether the circuit court correctly reversed those findings, such that the number of signatures on Khokhar's petition dropped below the 118-signature threshold. The court found clearly erroneous the Board's decision, on the basis that its rule required additional evidence, not to undertake review of those signatures, where the court did not find additional evidence necessary for an assessment of those signatures' validity. Accordingly, it found contrary to the manifest weight of the evidence the Board's finding that Corbin failed to meet his burden of proof.

¶ 19    We respectfully disagree. The Board's finding that the signatures were valid was ultimately premised on its interpretation of its own rule. As previously noted, electoral boards may adopt their own rules of procedure and rules of evidence (see 10 ILCS 5/10-10 (West 2018)), and, unless its decision was arbitrary or unreasonable, we defer to the board's application of its rules (*Wiesner*, 2016 IL App (2d) 160115, ¶ 34). However, we note that, even if viewed under the

clearly-erroneous standard, we are not left with a "definite and firm conviction" that the Board made a mistake in finding valid the 10 signatures at issue.  See *Cinkus,* 228 Ill. 2d at 211.

¶ 20    The record reflects that the county clerk had already entertained Corbin's objections to various signatures.  The clerk compared the signatures on Khokhar's petition with signatures in the clerk's records, and while some of Corbin's objections were sustained, the clerk ultimately overruled others and found some of the challenged signatures remained valid.  The Board's rules of procedures state: "at any subsequent record check objection hearing before the Board, *the ruling made by the clerks shall be deemed valid*, and the moving [p]arty shall have the burden of demonstrating that the ruling was incorrect by a preponderance of the evidence."  (Emphasis added.)  Thus, Corbin's request that the Board again review those signatures, in the absence of any additional probative evidence, merely amounted to a request that the Board simply repeat the process.  Yet Corbin did not offer a *basis* for challenging the clerk's assessment of the signatures' validity, other than his disagreement with the clerk's findings based on the already-performed handwriting comparison.  Where the rule placed upon the moving party the burden to demonstrate that a presumptively-valid signature was more likely than not invalid, it was not unreasonable for the Board to require some evidence or persuasive argument that would *rebut* the handwriting analysis performed by the clerk.

¶ 21    Indeed, under its rules, the Board had decided, for purposes of running an efficient hearing, that, without more, it would not simply second guess the handwriting comparison performed by the clerk. It adopted the clerk's decisions and found those signatures valid.  That the circuit court performed the same comparison as the clerk, but came to different conclusions, might *support* the Board's interpretation of its rule as requiring some additional *evidence* to establish that the signatures were more likely than not invalid, before undertaking the time-consuming process of

looking at them yet again without the benefit of affidavits from handwriting experts, affidavits from alleged signatories reflecting that the signature was not theirs, and/or voter-registration records reflecting the signature could not be counted. By performing its own handwriting comparison, the circuit court effectively conducted *de novo* review of the Board's factual findings, when, in the absence of anything offered by Corbin to suggest otherwise, the manifest weight of the evidence reflected only that those signatures were valid.

¶ 22 We also note that, although not his burden, Khokhar *did* apparently obtain affidavits to *establish* validity for some of the challenged signatures. In addition, although the court struck the signature appearing on line 7 of sheet 11, the Board had earlier discussed that signature and reviewed it, upholding its validity, and, so, it did not fall purely into the category of signatures not considered. Accordingly, we are not left with a definite conviction that the Board made a mistake; we conclude that the Board's interpretation of its rule was not unreasonable, and its findings were not contrary to the manifest weight of the evidence. We reverse the circuit court's decision to strike the 10 signatures, and we affirm the Board's decision that the signatures were valid, that Khokhar's petition contained the statutorily-required minimum number of signatures, and that his name appear on the April 6, 2021, consolidated election ballot.

¶ 23 We separately conclude that Khokhar's name must appear on the ballot in the interests of justice. Unlike the circuit court, the Board here collectively faced Corbin's objections to three candidates for Village President, as we do now, albeit in separate, but related, appeals. As previously noted, in appeal Nos. 2-21-0085 and 2-21-0086, two candidates for Village President appear on the ballot, despite having submitted far fewer signatures than those obtained by candidate Khokhar. Our analysis with respect to the estoppel arguments raised by those candidates need not be repeated here, except to say that we have affirmed the Board's findings, such that those

candidates should be allowed to remain on the ballot, despite not satisfying the statutory-minimum threshold.

¶ 24    In our view, and in light of our decisions (affirming the Board's decisions) in those cases, the interests of justice will best be served by allowing Khokhar's name to also appear on the ballot. Unlike the two other candidates, we concluded above that the Board correctly found that Khokhar did, in fact, satisfy the statutory-minimum requirement in his submitted signatures. However, even if he had not, his submission was just short of the 118 signatures required, while the two other candidates remain on the ballot having submitted 50 and 32 signatures, respectively. In *Merz v. Volberding*, 94 Ill. App. 3d 1111, only one of three candidates whose candidacies were before the court testified to relying on a clerk's misinformation, such that only he could invoke estoppel. Nevertheless, the court decided that, in the "interests of justice," the two other candidates (also lacking sufficient signatures, but not having available to them an estoppel claim) should *also* remain on the ballot, because they had demonstrated at least a minimal appeal to voters and their removal would, therefore, also penalize those voters. *Merz*, 94 Ill. App. 3d at 1118. Indeed, the goal of the signature requirement is that candidates establish a minimal appeal to voters. See, *id.* (citing *Briscoe v. Kusper*, 435 F.3d 1046, 1054 (7th Cir. 1970)). Khokhar's signature submissions here established a minimal appeal to voters more closely than either candidate in the related appeals and, thus, keeping his name off the ballot, while leaving them on, would penalize not only him, but also the Glendale Heights voters. See *id.*; see also, *Atkinson*, 2013 IL App (2d) 130140, ¶ 21.

¶ 25    As explained in our related decisions, the supreme court has expressed skepticism of the *Merz* decision, although not on the basis for which we rely upon it here. See *Jackson-Hicks v. East St. Louis Board of Election Commissioners*, 2015 IL 118929, ¶¶ 38-40. We also recognize

that *Merz*: limited its holding to the facts before it; noted that the statutory signature requirements are mandatory and should be strictly followed; yet concluded that the integrity of the electoral process would be upheld by allowing, in that case, the candidates to appear on the ballot despite their failures. *Merz*, 94 Ill. App. 3d at 1118. Similarly, we strongly emphasize here that this aspect of our decision should not be read broadly or construed as minimizing the importance of strict compliance with statutory requirements. Rather, we are in the unique position of considering the viability of Khokhar's candidacy, in light of decisions made with respect to his opponents, as well as the ramifications of those decisions upon the integrity of this electoral process, should he not be allowed on the ballot. We would expect such circumstances to arise infrequently, if ever again.

¶ 26                                  III. CONCLUSION

¶ 27     For the foregoing reasons, the judgment of the circuit court of Du Page County is reversed, the decision of the electoral board is affirmed, and this cause is remanded to the circuit court of Du Page County with instructions to enter judgment: (1) declaring that Khokhar's nominating petitions contain the minimum number of valid signatures required by law; (2) holding that Khokhar qualifies to have his name appear on the ballot as a candidate for the office of president in the April 6, 2021, consolidated election; and (3) ordering that Khokhar's name be immediately placed on the ballot for that election. Our mandate shall issue forthwith.

¶ 28     Circuit court judgment reversed; Electoral Board decision affirmed.

¶ 29     Mandate issued forthwith.